Next case is BOSTON SCIENTIFIC v. CORDIS, 2012-13-16. I'm here for Mr. Biscant for CORDIS. MR. BISCANT Thank you, Your Honor. May it please the Court. This is an appeal that presents two very interesting issues, one involving but-for causation for damages and the other willfulness, and I'd like to address both. First, with respect to but-for causation, the Cipher stint, the Cipher 2.25 stint, was launched in September 2009. You should know a little bit about it, which is that it used the patented JANG technology for its architecture, which made it the least flexible stint on the market and was in the end responsible for its significantly declining sales. However, it had an advantage, which was the drug it used, sirolimus, was considered by many to be the best. The problem, it seems to me, that you have here with regard to damages and lost profits is that there was a trial and you might have put on some evidence, which we can call out now in the briefs that cut your way, and I appreciate that, but they had several witnesses, Ms. Woodford, Dr. Goldberg. I mean, they had plenty of testimony to support their position, and we can assume that the jury believed those experts, perhaps not yours or perhaps some of what yours said, and they came to your conclusion. So are you here saying that there's some sort of basic legal error here? Yes. And that's what? The legal error was that all the evidence that was presented, which I'd like to discuss briefly, all the evidence that was presented did not grapple with the true issue of but-for causation, and the true issue was this. It was an undisputed fact that some doctors would not use the Texas stent. It was an undisputed fact that that population became larger exactly the same time that our stent was launched in September 2009. BSC said publicly, recently published data, have negatively affected physician and patient confidence and our sales. Okay. So let's assume the jury believed that, and they accounted for that in their ultimate award, which was less than what the other side was seeking. Okay. That takes you to the next question. So first, so now you know there are doctors in the population who simply won't use their stent. Secondly, you also know that those doctors have choices, and that's also undisputed. The choices come from Boston's own documents, from Boston's witness, and from our witness. Well, if we're talking about the small vessel market, then it's limited to two parties because that's all the FDA has approved, right? That's not correct. So if you define that, I'm sorry, it's not correct? Well, it is true that the FDA has approved only two drug-eluting stents for the small vessel market, but it is not true that the small vessel market consists only of those two stents. The small vessel market treatment options for doctors include, according to BSC's own internal documents, its witness and our witness, include undersizing 2.5-millimeter drug-eluting stents, which is not a radical idea. Let me just be clear. The 2.5 stent and the 2.25 stent are exactly the same stent. They just have a different balloon, and so doctors choose the balloon to get the expansion they want. It is common practice accepted by both side physicians to undersize a 2.5-millimeter stent, and they do it all the time. Dr. Goldberg said he does it most of the time when a 2.25 vessel is being addressed. So there's a panoply of 2.5 drug-eluting stents. There are also a large number of 2.25 bare metal stents that do not have drug on them, and there are lots of those. Dr. Goldberg testified, their expert, that he doesn't even use a drug-eluting stent one-quarter to one-third of the time. So there are many choices. So a doctor confronted with a small vessel, I haven't even mentioned angioplasty or drug therapy. A doctor confronted with a vessel has choices about what to do, and the problem with their case is they never addressed. Essentially, their sales went down 17%. They went from 6% of the market to 4%. Those are market share numbers. I think the more accurate way to look at it, if you look at page 44 of their brief, there's a chart of unit sales, and the unit sales go down about 17% drop of unit sales. That was the basis of the damages case, the drop in sales, not market share. So their sales go down about 17% upon the launch of our product. Who are those 17%? We say those are the doctors who don't want to use a paclitaxel stent. And so when you talk about options, you talk about what a doctor might do, you need to prove, they need to prove that there's someone, someone out there who would actually choose that way, and they didn't. They don't have any evidence. There's a good analogy in the antitrust cases. In the antitrust case, this issue of alternative causation does not arise all that frequently in patent cases, although I think it's a very interesting legal question. In the antitrust cases, if you have an alternative explanation for which there's prima facie evidence that's raised by the defendant, then the plaintiff has to disprove it as part of his burden of proof. And we came forward with an alternative explanation, which is that 17% drop in sales is accounted for entirely by doctors who won't use their stent. But there were plenty of doctors who would. Yes. And what said the record supports a finding that a specific market existed for two and a quarter. The demand for the taxes in the cipher was interchangeable. There was an absence of acceptable alternatives for two and a quarter. In other words, there was a basis for the decision. Well, those words were said in the decision. I don't believe there's a basis in the record for those findings. The reason there's no basis in the record for those findings. I think she pointed to evidence and testimony in her discussion which supported those findings. There may have been inconsistent evidence, but there is evidence in the record to support those findings. That's what she said and she pointed to that. Well, for example, Dr. Goldberg's quoted as saying that the products are interchangeable. But when you look at what he actually said, he says, what's your opinion on whether this is from A6651. What is your opinion on whether there are cases where a physician could implant the 2.25 millimeter cipher but not a taxis atom set? And he says he's not aware of that. They could both be implanted in the same place. Well, I agree with that. But it doesn't deal with the doctor who won't do it because he thinks the atom is dangerous. Your time runs out. You want to move to the willfulness issue? I do. Let me ask you about that because, one, is it your position that the filing of a re-exam would necessarily, just as a matter of law, give a sufficient basis because we assume a re-exam is filed in good faith? Or is it because the nature of the arguments made, that you made, your client made, in connection with the re-exam were sufficient to satisfy what was necessary? Well, I certainly do not think there are black-and-white rules in that filing a re-exam gives you a free pass. So I completely do not espouse that point of view. So what was there about this re-exam that made it sufficient to overcome that? This re-exam was a very interesting one. This re-exam was filed, and let me start with, this court has repeatedly said that a litigant that loses in court has the right, under our law, to seek a re-exam. And we sought a re-exam because the claim construction that was adopted in this court was considerably broader than the claim construction under which the patent had been reviewed by the PTL. And no one's ever disputed that. But talk about willfulness. Yes. And the product was launched before the re-exam was filed, right? The product was launched two weeks before the re-exam was filed. The re-exam was a massive document. And ultimately, the re-exam failed, right? That's true. Let me ask you, in your grade brief, so you can include this in your response, it was a little troubling to me. In your grade brief at page 18, you lead off a paragraph with the statement, BSC all but concedes claim 36 is invalidity. I read red. I read the record in this case. I saw no hint of a concession by BSC that the claim 36 was invalid. So I guess I'm troubled by the basis for you to make what seems to me a very bold statement without any basis for that. Tell me what the basis is. Well, the particular basis for that comment came out of the footnote, which you'll have to find. Excuse me. There's a footnote in BSC's brief in which it essentially explains why it has not defended the validity of claim 36, saying it didn't have to because of its legal arguments. Am I misunderstanding it? They had an argument on invalidity. And your whole argument, your re-exam, at least in part, was based on this one reference, this prior art reference, that wasn't before the Patent Office initially. And their response to that, I understood to be that it was not, in fact, prior art, because their claim dates back. So that doesn't concede invalidity. That's an argument as to why it's not invalid. Where's the concession on invalidity? Excuse me. In the context of the back and forth, I understood us to be saying, and we have to look at the text to say it, I understood us to be saying that, but for that legal argument, they conceded. I thought that's what we were saying in our discussion. All but concede the invalidity, page 18 of Gray. This is in the context of, it says a second, it goes right to the legal argument. Their argument is, they have a legal argument why it's invalid. They don't have a factual argument. That was the point that we were making, and I apologize if it sat poorly with you. But the real point is that we had a very substantial set of arguments on invalidity. The Patent Office had never considered whether this was a valid patent under the claim construction that this court adopted. We were giving it the first time to do that, and the challenge to invalid patents is an important public interest. The court has found that many times, and this was the first and only time the PTO ever considered whether a patent should be issued with claims as broad as those addressed by this court. I don't think that's bad faith. I don't think we were proceeding, notwithstanding a high likelihood that the patent was valid. And I think that you're allowed to go forward. Well, no one is suggesting that you didn't have the right to file a re-exam. The question is whether it should get you sufficient to get you out from under the willfulness in the earlier case. So, I mean, nobody's saying you didn't have the right to file a re-exam. Well, we then weren't allowed to present the evidence of why what we were doing was reasonable and why we didn't have a high likelihood of infringing a valid patent. That was just taken away. We weren't given a trial on these issues. We have objective and subjective good faith. We have witnesses to explain why it is that this re-exam was filed and why we believe the patent is invalid. We have heartfelt persons who believe that. I am personally one of them, Judge. The court denied us our trial opportunity in which they have the burden of proving by clear and convincing evidence that we proceeded notwithstanding a high likelihood that we were infringing a valid patent, both on an objective and a subjective basis. And that was just thrown out. You are in front of a rebuttal. Would you want to save it? That's the point I want to make on willfulness. I'll save it. But we were entitled, in my view, to a trial on these issues. There was no basis to say this is simply irrelevant and highly prejudicial. We were entitled to stand before a jury and explain why we did it. And they were required to prove by clear and convincing evidence why what we did was reckless. I don't think it was. Thank you, Mr. Diskant. Mr. Park. Good morning, Your Honor. May it please the court. I'd like to address some of the points that Mr. Diskant made in his opening statement, opening argument. First, Mr. Diskant made note of the fact that there are some doctors that do not want to use taxes under any circumstances. Ms. Woodford structured her damages analysis so that she was only accounting for those physicians that had already demonstrated a willingness to use tax extents. So in this particular situation, Boston Scientific was not assuming that it would have made a greater portion of sales than it had already demonstrated that it could make. And so I think Ms. Woodford's damages analysis already selected out those particular physicians that demonstrated that they were not willing to use tax extents. Mr. Diskant referenced the SEC statements. I think his references to the SEC statements don't necessarily tell the entire story. If you look carefully at those studies, at those SEC statements, it is true that Boston Scientific said that it lost sales because of these TCT studies. However, an important factor to consider is that the TCT studies involve the Zion stent, the stent that's not involved in this litigation. And was all of this put before the jury? Yes, Your Honor, it was. The jury was specifically informed that the Zion stent was available in a 2.5 millimeter size and above. And so for those sales, it was directly competing with the tax extents. And because of the results of these studies, Boston Scientific was losing sales. However, there was no 2.2 millimeter Zion stent. In the 2.2 millimeter drug-eluting stent market, there was only taxes atom and 2.25 millimeter cipher. And the jury was also shown data, actual sales data showing that the sales trend for all of the taxes stents was very different than the sales trend that you saw with the 2.25 millimeter drug-eluting stents. And so we submit that that was substantial evidence for the jury to consider and discount court's statement that Boston Scientific has somehow admitted that it was losing sales in 2.25 millimeter market because of the TCT studies and not because of the launch of the taxes, I'm sorry, the 2.25 millimeter cipher stent. And the jury also had evidence about J&J's intent-ray market share. Yes, absolutely, Your Honor. I mean, that was, I think it's a difficult argument for courts to make that these stents weren't competing with each other head-to-head in the market. But jury was certainly given evidence with respect to internal court's marketing documents, strategy documents saying that is our goal. Our goal is to take sales in this small vessel market. If you look at court's press release, the press release as well talks about how wonderful the 2.25 millimeter cipher stent is. And the only other drug-eluting stent that court has mentioned in his press release is Taxes Atom. And in addition to that, there was even a price matching program that court has had implemented. So there was plenty of evidence for the jury to conclude that these two products were competing against each other head-to-head in the 2.25 millimeter drug-eluting stent market. Another thing that court has mentioned was Boston Scientific's documents regarding the various choices that physicians had with respect to treating patients that had disease in small vessels. Again, I think court reaches a little bit too far in its interpretation of those documents. Physicians and experts from both sides provided testimony that drug-eluting stents provide significant benefit over these other treatment options. And this treatment option was very important in the small vessel size where the risk of restenosis is even higher than with larger vessels. Can we move you to the willfulness issue, which is somewhat tricky, right, and somewhat different than one we've confronted before? Let's assume we don't buy into one of the arguments you make in red, which is somehow that Seagate is inapplicable to any of this because it only dealt with the initial merit case. Let's assume we don't think that Seagate really thought about or dealt with that issue. It's not your position that we necessarily would come up with a blanket rule saying you can never consider the fact of a re-exam or the substance of the re-exam in connection with willfulness. Absolutely, yes, Your Honor. We do not make that. We're not trying to make that point. The facts of this case are unique in that, well, they're not unique, but they're unusual, in that the typical willfulness case, the accused infringer uses information or events that occur in the re-examination to justify the reasonableness of the arguments that are made in the district court action. I'm not aware of any cases where the events in the re-examination were relied upon to somehow prove or demonstrate that the claims being re-examined themselves would have been held unpatentable by the patent office. Well, it's conceivable, right, though? Let's assume you have a strong re-exam case and it's based on prior art that was not previously disclosed. Let's assume it is prior art. I know your view of the so-called prior art in this case is that it wasn't prior art. At least with regard to the subjective belief, not necessarily the objective, there could be cases in which it was strong enough that, given the circumstances, it might be relevant to a determination of willfulness. No? I think, as Your Honor had previously noted, it is a tricky question, and it is a tricky question because it does involve a lot of speculation. If we were to just, for example, take a look at the statistics of re-examinations, I mean, notwithstanding the fact that a particular re-examination requester believes very strongly in their case, if you just were to look at the PTO statistics the last time I checked, re-examinations are granted in over 90% of cases. And if I recall my statistics correctly, in the Hoek-Seleny's case, the number of instances where the narrowest claim, which Claim 36, Asserted Claim 36, in this case would fall under, the number of instances where the narrowest claim is actually found unpatentable is 5.6%. It was something on the order of 6%. So I think there is inherently... Well, I'm not suggesting the rule ought to be that just the filing of a re-exam necessarily negates a willfulness finding, but isn't it incumbent upon the fact-finder to look at the merits of that re-exam and, you know, to see whether it does raise either a question under the subjective or the objective prongs of Seagate? I think that the problem with that inquiry, Your Honor, is it's just subjectively or inherently unreliable. It's difficult for any fact-finder or... Well, you say there's a problem with the inquiry. You're suggesting, therefore, that there ought to be a blanket rule that re-exams are not indicative of anything and, therefore, they can't be used in any way, shape, or form in connection with the willfulness determination. Oh, absolutely not, Your Honor. So, for example, if you have a case where there's a district court defense by the accused infringer and, you know, they believe in good faith that in their defense in the district court action, then there have been many instances where courts have looked to an office action or even the granting of a re-examination request as supportive evidence that the arguments being made in the district court action are legitimate. Okay, so you're right. We're talking about a different proceeding, a subsequent proceeding where there's already been... patent has already been found to be valid and infringe. But what does that... So, are you stating that in this circumstance when there's already been a trial on the merit and it's been adjudicated and then you file for a re-exam that, just per se, that re-exam is not relevant in any way, shape, or form to the subsequent inquiry of willfulness? I certainly am very uncomfortable making a per se type of pronouncement. But certainly, for example, in hoax LNAs and acoustical design, this court noted that interim office actions or interim PTO proceedings are not indicative in any way of the final result. Well, the district court cites those cases and what she says, it's well established that the grant of a request for re-exam does not necessarily establish the likelihood of patent invalidity. Yes. I mean, I think we all, you know, I don't think anybody around here is disputing that. But that doesn't really answer the question whether it's not necessarily. That doesn't create a very bright line rule, right? Well, what is relevant? The ultimate outcome? The fact that the claim was confirmed? That is certainly a very relevant factor and it certainly plays into this. It's not relevant to a subjective view. Right. I mean, certainly one could not, did not know that that was going to be an event that was going to happen when the action was taking place. And what relevance is the timing of the filing of the re-examination in relation to their market introduction? Certainly that cuts against their reliance on this re-examination defense. As your Honor has noted, CORTIS had launched without even, not even before it filed the re-examination. I mean, they could not have relied on an event that hadn't even occurred. But before it was, this was almost a year before the first office action. Well, they were thinking about it. I'm sorry? They were thinking about it. They were certainly thinking about it, but in terms of procedure, I think anything could have happened within that time period in between and certainly, you know. They could have not filed it. They could have made some decision which would have led to them not filing it. So until you actually, until the rubber actually hits the road, I think it's a little bit, a little too speculative. But the fact that they filed it, what, two days after the introduction clearly would indicate that they intended to do it before the introduction. We don't put things together in two days. Right. That's correct, Your Honor. Was it two weeks or two days? I'm sorry? Was it two weeks or two days? It was about three weeks, I think. Three weeks. But I certainly take your point, Your Honor, that, you know, re-examination, preparation doesn't occur right away. At the same time, I think, I don't think that they were completely caught off guard. You're saying it could be a tactical move. Absolutely, Your Honor. I definitely think that that was the possibility. And beyond that, in red at least, you go through the whole timeline of the re-exam, suggesting that the way it all went down and the way requests were made and the timing of that, that it was all done tactically, right? Yes, Your Honor. I think it's a little bit much to think that it was just coincidence that each time the patent office had made some indication that the patent was going to, the re-examined claim was going to get confirmed, that weeks after that, a new re-exam was, re-exam request was sent in. If Your Honors. No further questions. Mr. Park, thank you very much. Mr. Discant has just under two minutes rebuttal. Okay, thank you. Let me just say one sentence about damages and then talk about lawfulness a little bit more. On damages, I would ask the panel to look closely at the record, to look at the Panduit factors and to essentially... This rebuttal? I'm sorry? This rebuttal of what we just heard? Yes. Well, he argued all these arguments about the Panduit factors. I'm just asking you to address them, if you would. I didn't hear him argue the Panduit factors here. I'll skip it, Judge Lurie. I don't mean to misuse my time. But I think the basic problem with the point the counsel was making on damages is none of the arguments he makes address the choices of a doctor who doesn't want to use the taxes stamp. And that's just the basic problem with the damages case. On willfulness, I think we probably have something like a consensus that there aren't black and white rules and you need an individualized assessment of the particular re-exam before you can make any judgments about it. And I think the simplest thing that's true is that that didn't happen here. In this case, the district court excluded evidence of the re-exam because, as she said, she has a general tendency to exclude re-exams. And that was it. There wasn't a, let's take a look at this one and make a reasoned judgment. It was more of a, they don't come in because they tend to be more confusing than probative. And the confusing end of it, I think, doesn't bear any weight in a case that has no validity case. Where there's a validity case, you certainly understand the confusion risk. Here, it's just proving some facts and letting the jury assess them. When it comes to what one looks at, Judge Prost, as you said, a grant doesn't mean much of anything. But four rejections, including one final rejection, means something. And indeed, an old reliable case in this court, there was an intent to confirm a patent, later withdrawn, and this court found as a matter of law that that negated objective recklessness applying the Seagate standard. It was an attorney's fees case, but the court explicitly said the standard was the same as the Seagate standard and it relied, so far as I can tell, only on the actions in the re-exam in finding the failure to show objective bad faith. So, I think this is highly probative evidence. As to timing, I think what Seagate does... If you just can, I think your time is up. Okay.  and take the case under advisement. Thank you, Judge.